Filed 4/29/21  P. v. Hinson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM LAMAR HINSON III,<br><br>        Defendant and Appellant. | A157134<br><br><br>(Humboldt County<br>Super. Ct. No. CR1605709) |

Defendant appeals from his conviction for voluntary manslaughter following a jury trial.  (Pen. Code, § 192, subd. (a).)[1]  The jury also found true the enhancement allegation that defendant personally used a deadly weapon during the commission of the crime (§ 12022, subd. (b)(1)).  On appeal, defendant contends the trial court abused its discretion in admitting two wooden boards found near the area of the victim's assault, and that it erred by giving the flight instruction (CALCRIM No. 372) and the consciousness of guilt instruction (CALCRIM No. 362) and by not giving the justifiable homicide: non-peace officer preserving the peace instruction (CALCRIM No. 509).  We affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

1

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves the death of Khanh Lam, after he was involved in a fight while he was passing through Garberville on July 18, 2015. During the fight, Lam was hit in the head and knocked to the ground, and he died several days later. Defendant and Raymon Preschern were both charged in connection with the homicide.[2] On September 28, 2017, the Humboldt County District Attorney filed an information charging defendant with murder (§ 187, subd. (a)). The information also alleged that defendant personally used a deadly weapon during the commission of the murder (§ 12022, subd. (b)(1)).

At the conclusion of the prosecution's case-in-chief, the People reduced the charge to second degree murder. On February 26, 2019, the jury convicted defendant of the lesser included offense of voluntary manslaughter (§ 192, subd. (a)). The jury also found true the enhancement for personal use of a deadly weapon during the commission of the crime (§ 12022, subd. (b)(1)). On April 8, 2019, the trial court sentenced defendant to seven years in state prison, with 1,018 days of credit for time served.

## I.    *Prosecution Case*

### A.    **Lam Arrives in Garberville**

On Saturday, July 18, 2015, Lam was on his way to the San Francisco International Airport to meet family when his truck broke down near Garberville. The truck stalled because Lam had filled it with the wrong gas. He contacted a friend, who, in turn, put him in touch with Erin T., who lived in Garberville. Lam had his truck towed to Erin's residence, which was near

---

[2] Preschern was charged with voluntary manslaughter. He pleaded guilty to felony assault, and the voluntary manslaughter charge was dismissed. His testimony in defendant's case was not part of his plea deal.

the Garberville town square. Erin gave Lam a hose and bucket for Lam to use to siphon the fuel out of his vehicle. Lam's small dog wandered around while Lam worked on his truck.[3] Erin paid no attention to Lam, and sometime around noon she realized he was gone. She went to a friend's house for the afternoon, and when she returned home she learned from the police that Lam was in the hospital.

## B. Altercations at Van and in Alley Behind Blue Room Bar

Daniel L. and his wife Donna L. owned a flower shop near the Garberville town square. On July 18, 2015, as Daniel and Donna loaded flowers into their truck, Daniel heard a commotion coming from the square, about 40 feet away, and saw four or five people around a van. At some point Daniel saw the group, which included an Asian male, running down an alley. Donna also saw a group running into the alley, behind the Blue Room bar. She thought it was a group of 10 to 12 people. Later, Daniel saw a group of people returning from the alley, and one man waved a two-by-four above his head. Donna thought she saw a man with a two-by-four in his hand coming back from the alley, toward the town square.

Three additional prosecution witnesses testified about the altercations at the van and in the alley. Their testimony varied in some respects, and each witness contradicted himself at times.

### 1. Raymon Preschern

Preschern has memory problems due to a head injury he suffered from a previous fight, in 2014. He is also legally blind without his glasses. He testified he "sort of" remembered July 18, 2015. That day, he, defendant, and others, including Kenneth H., Jack B., and possibly Reginald N., were in the

---

[3] Later testimony indicates that at some point Lam could not find his dog, which led him to initiate an altercation at the van.

3

Garberville town square.  Preschern had only known defendant for a couple of weeks.

Sometime between 11:00 a.m. and noon, Preschern heard a woman yelling, " 'Help.' "  He looked in the direction of the scream and saw a van with its doors open and an Asian man punching the woman in the face.  Preschern ran to the van.  He was the first to arrive at the van, and Lam was still punching the woman.  Lam had his other hand on the shirt of a child and was trying to pull the child out of the van.  Preschern pushed Lam away.  Lam stumbled and released the child.  The woman said something like, " 'Help.  He was trying to take my kid.' "  The woman was standing by the van door, and inside the van were a man in the driver's seat, three small children, and at least two older children.  Preschern was aware that there were other people around him.

Lam ran away from the van toward an alleyway, yelling, " 'Go get my gun.' "  Preschern chased after Lam.  Around a corner and in the parking area of an apartment complex near garages, the Blue Room bar, and a guardrail, Preschern saw Lam enter one of the garages before being shoved or thrown out.  Then, the driver of the van arrived and began fighting Lam.  Preschern saw the driver[4] punch Lam in the face four or five times, as well as in the ribs.  Preschern thought the driver looked like a professional boxer and had the advantage over Lam.

The driver knocked Lam to the ground.  Lam got up and grabbed a small stepladder that was near a closed garage door and swung it at the driver, knocking him down.  At that point, Preschern stepped in to protect the driver from a second blow from the ladder by deflecting it as Lam swung the

---

[4] The driver was not identified and did not testify at the trial.

ladder. The ladder broke, cutting Preschern's arm. Lam threw the ladder aside or dropped it.

Preschern punched Lam twice on the nose and Lam punched back. At some point, Preschern's glasses were knocked off his face. As Lam tried to run away, Preschern picked up a squirt gun from the ground and threw it at Lam. The men moved to the area behind a garage closer to the guardrail. On the ground near the guardrail were some boxes or wooden crates or pallets. At the guardrail, as Lam had one foot on the ground and one knee on a stack of pallets, Preschern grabbed Lam by the hair and punched him two more times with right hooks. Preschern testified that his fifth and final punch knocked Lam over the guardrail and to the ground.

As Preschern threw his punches, he was not aware of anyone else around him. After Preschern's final punch knocked Lam unconscious, Preschern then became aware of a group of people standing near him, including Jack B., Reginald N., and defendant. However, Preschern also testified that even at that point he was not aware of anyone but Lam on the other side of the guardrail.

Preschern testified that he heard a "wet thud" sound when his fist made contact with Lam for the final time and Lam fell over the guardrail. However, Preschern did not think the sound was his punch. Preschern testified both that he heard a "dry crunch" sound before he heard the "wet thud" sound and that he could not tell if the "wet thud" sound occurred "exactly as [his] fist made contact with Mr. Lam or if it was a blink of a second before or after."

Preschern did not see defendant or anyone else strike Lam with a stick or board. He saw only a "side-to-side" movement from some unknown object or person directly one or two feet in front of him as he punched Lam.

5

Preschern's testimony had several inconsistencies. First he said he would have been able to see a board or stick come down on Lam's head, and then he said he would not have seen it because he was not paying attention and had "tunnel vision" on Lam. Preschern also testified that he was "99, if not a hundred percent sure" defendant was in front of him at the guardrail where Lam was knocked out, but also that he could not be "99 or a hundred percent certain" that defendant was the person on the other side of the guardrail.

As Lam lay on the ground, Preschern said to him, " 'You fucked with the wrong town.' " Jack B. stayed with Lam until the fire department arrived. Preschern walked back to the town square, and within five minutes the woman from the van came to him with an ice pack and Preschern's glasses. Defendant was in the square too, but left between 10 and 20 minutes later. The van also left.

Preschern spoke with police on July 18, 2015, but because he feared being jailed for knocking Lam out, he told the police he had just arrived in the area and did not know what happened. The following day, Preschern saw Reginald N. throw a bloody four-by-four into a dumpster.

For several months after the assault, Preschern worked with defendant at a marijuana farm and as security for a reggae festival. They did not discuss the assault in detail. Preschern gave conflicting testimony regarding what defendant told others at the farm. Preschern said he heard defendant tell someone else at the farm that "he's the one that—that swung the—the four-by-four, or whatever it was. The stick," and that defendant said something along the lines of, " 'I had to do what I had to do . . . .' " But Preschern also testified that he did not know what defendant said to others about the assault. Defendant left the farm several months before Preschern.

In the summer of 2016, Preschern hitchhiked toward New Orleans. In Arkansas, he was picked up by an off-duty Arkansas police officer. Not knowing that the driver was a police officer, Preschern told him he was on his way to Florida to handle some business and told him about "this murder" in Humboldt County. The officer then identified himself and took Preschern to a police station to file a report. Preschern told the Arkansas police that defendant was involved in Lam's death, and made up a story mixing truth and lies. In Preschern's story, he falsely placed all liability on defendant and claimed he (Preschern) had not even been there. He explained that at the time he was angry with defendant and thought everyone was "ratting [him (Preschern)] out." Preschern told the Arkansas police that defendant hit Lam with a board or a stick because that is what he heard Reginald N. say.

In July 2016, Preschern was arrested and jailed in Portland, Oregon, for an unrelated offense. While there, he was questioned by Humboldt County deputy sheriffs about the Lam assault. Again, he told a mix of truth and lies. During the course of his interview his story changed from " 'I stayed at the van, didn't see anything' " to " 'Yeah, I was there and punched [Lam], but [defendant] hit him with the board' " to " 'I didn't see [defendant] hit him with the board.' " Preschern testified that in his final telling, he clarified that because his glasses had been knocked off and he is legally blind, he was not sure if defendant had hit Lam with a board.

Preschern was extradited to California and pleaded guilty to a reduced charge of assault.

2.    Kenneth H.

In July 2015, Kenneth H. lived in the woods near Garberville and worked part-time as a local handyman. On July 18, 2015, between 11:00 a.m. and noon, he arrived in the town square. Jack B., Preschern, and the

defendant were also in the square. About 15 minutes after he arrived, Kenneth heard a man screaming, " 'Hey, you have my dog in that van. I want it back.' " There was a family in the van, and they said they did not have a dog in the van and told the man he could look in the window. The man opened the van door and attempted to grab one of the children. When the adult man in the van tried to stop Lam, Lam hit the man, knocking him to the ground. Then the adult woman in the van tried to stop Lam from grabbing the child. Lam yelled, " 'I'm getting a gun. You're not going anywhere.' " Lam punched the woman two or three times.

Kenneth H. saw defendant and Preschern and possibly a third person run to the van. Defendant and Preschern began punching Lam, and Lam punched back. Then Lam ran down an alley, yelling about getting a gun. Preschern, defendant, and a third, unidentified person ran after Lam. Kenneth followed them into the alley behind the Blue Room bar. He saw Preschern and Lam punch each other and then Preschern put Lam into a chokehold. Lam "had too much rage" and "bolted right out of" the chokehold. Kenneth thought Lam was on PCP. Lam jumped over the guardrail and tried to go further down the alley. Defendant was already on the other side of the guardrail, and defendant picked up a four-by-four board as Lam charged at defendant. Defendant swung the board at Lam, hitting him once in the ribs and once on the side of the head. Lam fell to the ground and blood flowed from one of his ears. Defendant dropped the board. Kenneth walked up to look at Lam and shouted for a woman watching from a nearby apartment to call an ambulance. Then, Kenneth walked back to the square and saw the van drive away. Kenneth stayed in the town square for about 10 minutes and did not see defendant there.

### 3. Reginald N.

Reginald N. testified that he did not have a good memory due to years of smoking marijuana. Although he could not recall the exact date of the altercation involving Lam, he testified that he was present in the town square that day. Reginald saw an Asian man leaning into the van and heard a woman screaming, " 'Don't take my kid. Don't hurt my kid.' " He thought Lam and the woman were fighting over the child. Reginald saw a group of four to six people, including defendant, run after Lam as Lam ran into an alley. He followed the group but stayed between 15 and 70 feet away.

Reginald N. saw Lam fall over a guardrail, and as Preschern held onto Lam, defendant used a " 'golf club-type swing' " with a board to "unconsciously" hit Lam on the side of his head. After defendant swung the board, Reginald yelled, " 'Stop,' " and, " 'You guys are doing too much.' " Defendant looked at Reginald and dropped the board.

After Reginald N. yelled, " 'Stop,' " people dispersed from the alley. Reginald walked back to the town square. Defendant also returned to the town square. Reginald initially testified that he did not overhear defendant say anything but later testified he heard defendant say, " ' "We got him." ' " Reginald told defendant he had gone too far and said, " ' "You should probably go away for now and come back some other day, because you're going to get in trouble." ' " When the police arrived, Reginald went home.

### C. Paramedic Testimony

When paramedics arrived, they found Lam lying face up in a grassy area near a guardrail behind the Blue Room bar. He was having difficulty breathing and was bleeding from the head. The paramedics took him to the hospital, and he was placed on life support.

## D. Autopsy

Lam was eventually removed from life support and died. On July 25, 2015, Dr. Mark Super conducted Lam's autopsy. Lam had a potentially lethal amount of methamphetamine in his system, but Dr. Super concluded he died from blunt impact head injuries. Dr. Super believed Lam's injuries were intentionally inflicted and were not caused by a fall or an accident. He opined that Lam was struck by an object more than once. Lam also had bruises on his left chest, right flank, and right arm, and his right kidney was lacerated, which Dr. Super concluded had resulted from blunt force trauma. Lam also had fractured ribs. Dr. Super testified that based on the types of lines and scratches on Lam's head and his chest area, it was likely he had been struck by something with parallel ridges. Dr. Super believed it was unlikely that a fist caused Lam's head injuries and that it was possible that a two-by-six board caused the injuries.

## II. *Defense Case*

Defendant testified that from March to September 2015 he was working seasonably as a medical marijuana grower in Garberville, as he had done since 2010. He was 38 years old in July 2015, six feet four inches tall and 180 pounds. On the morning of July 18, 2015, defendant and a couple of other marijuana grow workers, including Preschern, drove from the grow site to Garberville to pick up supplies. The drive from the grow site to the Garberville town square was about 30 to 40 minutes. Defendant and Preschern were "close associates" who had known each other for a few months. Defendant and others, including Preschern, were in the town square around noon. Defendant and Preschern heard a woman screaming and saw Lam trying to take a child out of a van. Defendant saw Lam hitting the woman. Defendant and Preschern and others headed toward the van.

10

Preschern pushed Lam away. Lam kicked the defendant lightly in his leg near his "hernia area," but defendant did not fall to the ground. Defendant pushed Lam in response. Defendant heard Lam yell about getting a gun and saw him start running. A large crowd started chasing Lam. Defendant grabbed his dog and his backpack and left the town square. He went first to his campsite in town, and then, around 4:00 in the afternoon, he went back to the marijuana grow site with others, including Preschern. Surveillance video from a Radio Shack near the town square shows defendant walking away at 12:21 p.m. and talking with Daniel L.,[5] who owned the flower shop in Garberville.

Defendant testified that he did not injure Lam and denied hitting him with a stick, board, or any other weapon. He said he could not have done so and indicated he had an injured arm. He also denied ever being in the alley near the guardrail where Lam was injured, and he did not see the beating in the alley.

Three days later, defendant heard that Lam was in the hospital. From then until he left the grow site in September 2015 he heard nothing more about the incident. He went into Garberville on a few more occasions before leaving the area in September 2015. Defendant denied ever bragging about being involved in beating Lam.

In November 2016, defendant was arrested at his parents' home in Florida. After he was extradited to Humboldt County, he spoke with Detective Turner about the incident and told her he could not have been involved because he "worked on the mountains from May to September[.]" He then exercised his right to remain silent with Turner.

---

[5] Daniel L. testified he spoke with two men after the incident, but he did not recall if it was the same day as the incident or the next day.

Although defendant stated he did not see what happened in the alley and he never talked with anyone about it, he admitted that after he was arrested and brought to Humboldt County, he sent a letter to Humboldt County District Attorney Maggie Fleming stating that he could identify who was involved in Lam's death. At trial, defendant explained that although he did not see the altercation, he had "secondhand information" based on his discussions with Preschern.

Dr. Geoffrey Loftus, an experimental psychologist, testified as an expert in human perception and memory. He explained that postevent information can become a part of a person's memory of an event and that this can explain why multiple witnesses may remember events differently and might misidentify an assailant. He also testified that the confidence of a witness's identification does not correlate with its accuracy.

### III. *Prosecution Rebuttal*

The prosecution introduced recordings of multiple phone calls the defendant made to family members while he was jail. In the calls he talks about an altercation in which he "hit a guy like two times," causing his knuckles to swell, and that the man "kicked me in my stomach and took off running." In another call he states: "I only hit this guy, if he died afterwards, after I hit him, I didn't have, not have nothing to do with him because I was on the ground cuz he kicked me in my gut and I got a hernia. That's what I did, I told them, uh, the investigators, to subpoena my . . . medical records. [¶] . . . [¶] Yeah, I had a hernia still, so, you know, when I tell them I only hit the guy you know twice and everything and he kicked me in my gut and everything and took off running, I said, you know, I said if you bring this to any doctor they're gonna, you know, vouch for my story what I'm telling you, I was on the ground afterwards, you know, in pain and

12

everything." In other calls defendant repeated that he hit Lam twice by the van, that Lam kicked him "in my guts" and he "hit the ground" and "stayed on the ground," and that he did not see what happened after Lam was chased into an alley by a crowd. He also stated, "But I did hit him two times with my hand, that, which, may have caused him to, you know, receive a concussion or something like that and resulted in later on dying from the other concussions that people gave him, too."

## IV. *Defense Surrebuttal*

Defense counsel asked defendant to explain the discrepancies between the recorded calls, in which he repeatedly said he had been kicked in the area of his hernia and fell to the ground in pain, and his trial testimony during which he said he did not fall to the ground. Defendant explained, "It was a long time ago . . . . I mean, he did kick me. I probably did hit the ground." He also said that he pushed Lam once and slapped him twice. Defendant testified that after he fell to the ground, he was able to get up and walk away after a few seconds because he is used to his hernia pain. Defendant admitted that the surveillance video shows him walking away and he does not appear to be in pain.

On cross-examination, defendant acknowledged that he did not receive any discovery until the end of February 2017 or March 2017, which was after the phone call in which he said he " 'was on the ground in pain' " and that a doctor would be able to " 'vouch for . . . my story . . . .' " He also acknowledged that it was not until the end of 2017 when he saw the surveillance video showing him walking.

13

# DISCUSSION

## I. *Admission of wooden boards was not an abuse of discretion.*

Defendant contends the trial court erred when it admitted into evidence two wooden boards found several weeks later in the area of the assault. He claims the boards are irrelevant because there was nothing to connect them to defendant or to the crime. Alternatively, he contends that even if the boards were minimally relevant, they should not have been admitted because the probative value was outweighed by the likelihood of undue prejudice. We find no error.

### A. Background

On July 25, 2015, as part of her investigation, Detective Turner attended Lam's autopsy. During the autopsy, the injuries noted included scabbed striation marks near a laceration on the top of Lam's head and scabbed striations on Lam's left rib and kidney area. On July 30, 2015, Detective Turner inspected the area where Lam had been assaulted and found a four-by-four piece of wood which she collected as possible evidence. On August 6, 2015, she returned to the same area and located a two-by-six piece of wood, which she also collected. Both wood pieces had striations consistent with the marks on Lam's head and body.

Defendant filed a motion in limine to preclude the prosecution from comparing striation markings on Lam's head with those on pieces of wood found in the area of the assault. He argued there was no DNA, blood, or fingerprints connecting the boards to defendant or the victim and Detective Turner should not be permitted to speculate about any similarities. The trial court denied the motion, finding that witnesses could testify to their personal knowledge of what they saw and that the defendant's objections went to the weight of the evidence and not its admissibility.

14

Defense counsel objected when Dr. Super was asked to compare the markings on Lam's head with the markings on the two boards. The trial court allowed the questions subject to the prosecution establishing a foundation regarding the boards. Dr. Super testified that the markings on the boards were similar to those on Lam's head and body, but he acknowledged that he could not be certain if one of the boards caused Lam's injuries. Detective Turner testified that she found the boards within feet of where Lam was injured. She found the four-by-four board on July 30, 2015, and she found the other board on August 6, 2015. She testified that both boards had markings that were similar to the markings she saw on Lam during his autopsy. However, there was no blood or DNA on either board, and she did not know if they had any relationship to Lam's death.

The prosecution argued the witness testimony established the relevance of the two boards given that they were found near the scene of the assault and had similar markings to the markings on Lam's body. The trial court overruled defense counsel's relevance objection and found that the evidence was more probative than prejudicial. The trial court stated: "And next, is the introduction of that evidence prejudicial rather than appropriate?[6] I find it is appropriate. We have three witnesses—one is 99 percent sure by his testimony that [defendant] was at the scene of the decedent's demise or his injuries; two others, although there are discrepancies in their testimony, place a board in the defendant's hands. Again, this particular board [has] similarities to the striations on decedent's head, so I do find there is appropriate value to that. However, both prosecution witnesses cannot say with any certainty that the board is the

_____

[6] It appears there may have been a transcription error in which the reporter wrote "appropriate" rather than "probative."

15

board that inflicted the injury upon the decedent, so the decision is that I am going to receive item 46A and 47 into evidence; however, with the caveat, Mr. [Prosecutor], you're not to refer to the board in the presence of the jury as the murder weapon; you're not to refer to it as the probable murder weapon, or the more likely than not murder weapon because if that were true, that would be assuming facts not in evidence. You'd be misstating the evidence as it currently stands; therefore, mislead the jury."

## B. Analysis

We review rulings on the admissibility of evidence for an abuse of discretion and will not reverse unless it is established that the "court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) "Evidence is relevant if it 'ha[s] any tendency in reason to prove or disprove any disputed fact.' [Citations.] The trial court has broad latitude in determining relevance." (*People v. Howard* (2010) 51 Cal.4th 15, 31.) Here, the trial court acted within its discretion in concluding that the two boards found by Detective Turner during her investigation into Lam's homicide were relevant. The boards were found within feet of the area where Lam was assaulted, they had markings on them that corresponded with Lam's injuries, and two witnesses testified they saw defendant hit Lam with a piece of wood.

Defendant argues the boards are not relevant because nothing connects these particular boards to defendant or to the crime. We disagree. While it is true there was no DNA or blood evidence connecting the boards to defendant or to the crime and that they were found in the weeks following the assault, we agree with the trial court that this impacts only the weight of the evidence. (See *People v. Howard, supra*, 51 Cal.4th at pp. 22, 31–32 [gun

16

found six days after a murder near crime scene where defendant was seen on night of murder was "plainly relevant" even though no fingerprints were found on gun].)

Defendant relies upon *People v. McCall* (1935) 10 Cal.App.2d 503 and *Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862 in support of his argument that the boards were not relevant. These cases are distinguishable. In *McCall*, the defendant testified he had been in the victim's car, they had argued, and he had punched the victim with his fists on the night the victim sustained a head injury causing his death. (*McCall, supra*, at pp. 504–505.) The appellate court found it was error to admit into evidence multiple different items found in the victim's car which the prosecutor argued could have been used to injure the victim. (*Id.* at p. 508.) Here, unlike in *McCall*, the boards admitted into evidence had markings corresponding to Lam's injuries, two witnesses saw defendant hit Lam with a board, and Dr. Super opined that it was unlikely that a fist caused Lam's head injuries and that it was possible a two-by-six board caused the injuries.

In *Alcala v. Woodford, supra*, 334 F.3d 862, the prosecution attempted to show that the defendant was linked to a carving knife found near the victim's body by presenting "two complete, unused sets of kitchen knives that police seized" from the defendant's shared residence, which were the same brand as the alleged murder weapon. (*Id.* at p. 886.) The Ninth Circuit concluded the knife sets were irrelevant because they did not tend to prove that defendant was connected to the murder weapon. (*Id.* at p. 887.) Again, here, unlike in *Alcala,* there was testimony that the defendant hit Lam with a wooden board and that the markings on the boards found at the scene corresponded to markings on Lam's head and body. We agree with the trial court's determination there was at least "some relevance" to the boards.

17

Defendant argues that even if we find some minimal relevance to the boards, it was still error to admit them because any potential relevance was greatly outweighed by the danger of undue prejudice. He argues that the admission of the boards linked him to the murder weapon and undermined his defense. We disagree. "Evidence is not inadmissible under [Evidence Code] section 352 unless the probative value is ' "substantially" outweighed by the probability of a "substantial danger" of undue prejudice.' " (*People v. Fruits* (2016) 247 Cal.App.4th 188, 205.) " ' " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' " (*Ibid.*) " '[P]rejudicial' is not synonymous with 'damaging.' " (*People v. Yu* (1983) 143 Cal.App.3d 358, 377.) We find no abuse of discretion in the trial court's determination that the probative value of the boards was not outweighed by a substantial danger of undue prejudice. The jury heard testimony from Detective Turner that she did not know whether the boards were connected to the crime, a point highlighted by defense counsel during closing argument. The trial court did not permit the prosecutor to specifically refer to the boards as the murder weapon or the likely murder weapon, and during his closing argument he did not mention the specific boards admitted into evidence. Further, the evidence does not " ' " ' "uniquely tend[] to evoke an emotional bias against the defendant as an individual . . . ." ' " ' " (*Fruits, supra*, 247 Cal.App.4th at p. 205.)

## II. *Trial court did not err by giving consciousness of guilt instructions.*

Defendant argues it was error for the trial court to give consciousness of guilt instructions CALCRIM Nos. 362 and 372 because they were unsupported by the evidence. We review claims of instructional error de novo to determine whether the evidence supported the giving of the instruction.

(*People v. Cole* (2004) 33 Cal.4th 1158, 1217.)  As discussed *post*, we find the evidence supported both instructions.

## A. CALCRIM No. 372—Defendant's Flight

The trial court instructed the jury with CALCRIM No. 372 as follows: "If the defendant fled immediately after the crime was committed, or after he was accused of committing the crime, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled cannot prove guilt by itself."  The prosecutor argued to the trial court that the instruction was supported by Reginald N.'s testimony that right after the assault, he told defendant he " ' "should probably go away for now . . . because you're going to get in trouble" ' " and that defendant left in response to Reginald's statement.  Defendant argues the evidence did not support this instruction because Reginald's testimony was not credible and Reginald did not testify that he saw defendant leave.  However, as the People note, Preschern testified that shortly after the assault he saw defendant in the town square and that defendant left between 10 and 20 minutes later.

" 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." ' [Citations.] Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.]  To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence.  [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

19

We find the evidence of Reginald N.'s statement to the defendant immediately after the assault, coupled with Preschern's testimony that defendant was in the town square immediately after the assault, but left within 10 or 20 minutes, supported the flight instruction. From this testimony, the jury could infer that defendant left the town square " 'to avoid being observed or arrested.' " (*People v. Bonilla, supra*, 41 Cal.4th at p. 328.) Defendant argues that Reginald's testimony was not credible and that there was other testimony that defendant did not immediately leave the area after the assault. The other evidence to which defendant refers is Preschern's testimony that defendant went back to the town square; defendant's testimony that he spoke with Daniel L. after the incident, near the flower shop; and the surveillance video showing defendant walking with his dog and speaking to Daniel after the incident.[7] None of the evidence on which defendant relies is necessarily inconsistent with Preschern's testimony that defendant left the town square between 10 and 20 minutes after the incident. In any event, the fact that the jury could have interpreted the evidence differently does not mean there was insufficient evidence to support the flight instruction. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [sufficient evidence warranted flight instruction, and "the instruction . . . adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt"].)

---

[7] Defendant also misstates that Reginald N. "recounted walking back to town square with [defendant] after the incident." (*Sic.*) Reginald did not testify that he recalled walking back to the town square with defendant, although he did state he saw defendant in the town square and spoke with him.

Defendant further complains that the flight instruction was improper because it "completely undermined the defense theory." He asserts that the instruction allowed the jury to find consciousness of guilt if they believed his testimony that he left the area near the van when Lam yelled about getting a gun and then eventually left to go back to the farm later in the afternoon. We disagree. If the jury had believed defendant's testimony that he was not in the alley and did not know what happened, then the instruction would not apply because there would be no basis to find the defendant "fled [or tried to flee] (immediately after the crime was committed/ [or] after (he/she) was accused of committing the crime) . . . ." (CALCRIM No. 372.) However, if the jury did not believe defendant's testimony, then the jury may have applied the flight instruction based on a reasonable interpretation of parts of the testimony of Reginald N. and Preschern.

## B. CALCRIM No. 362—Consciousness of Guilt: False Statements

Over defendant's objection, the trial court instructed the jury with CALCRIM No. 362 as follows: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

This instruction is proper when there is evidence that defendant fabricated a story to explain his conduct. (See *People v. Griffin* (1988) 46 Cal.3d 1011, 1026–1027 [discussing CALJIC No. 2.03, the equivalent of CALCRIM No. 362].) "Deliberately false statements to the police about matters that are within an arrestee's knowledge and materially relate to his

or her guilt or innocence have long been considered cogent evidence of a consciousness of guilt, for they suggest there is no honest explanation for incriminating circumstances. [Citation.]" (*People v. Williams* (2000) 79 Cal.App.4th 1157, 1167–1168.) "When testimony is properly admitted from which an inference of a consciousness of guilt may be drawn, the court has a duty to instruct on the proper method to analyze the testimony." (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1104.)

Defendant argues the evidence did not support a finding that he fabricated a story about the offense. He asserts his "pre-trial stories were entirely consistent with his fundamental narrative at trial." He argues that Detective Turner's testimony that defendant initially told her that "it was not possible he committed this crime because he was on the mountain from May through September" does not support giving this instruction because it was not a false statement and it was "entirely consistent" with his defense theory. While it was undisputed that defendant worked on the marijuana farm from May to September 2015, his argument ignores the "it was not possible he committed this crime" portion of his statement to Detective Turner. When considered as a whole, a jury could reasonably infer that defendant's initial statement to Detective Turner was meant to imply he was not in the Garberville town square on the day of the incident and that his statement was misleading, at best.

Defendant also argues that the statements he made to family members in his phone calls from jail are not inconsistent with his defense at trial and therefore do not provide sufficient support for the giving of the consciousness of guilt instruction. In the phone calls, defendant admitted he had a physical altercation with Lam at the van and said Lam kicked defendant in his damaged "hernia area" and defendant was knocked to the ground in great

22

pain.  Defendant stated to his family members that he told investigators to subpoena his medical records and that "if you bring this to any doctor they're gonna, you know, vouch for my story what I'm telling you, I was on the ground afterwards, you know, in pain and everything."  At trial, during defendant's testimony in the defense case-in-chief, he testified that Lam kicked him "in my hernia area," but he said he did not fall to the ground and he initially denied he had said otherwise in phone calls from jail.

Defendant's statements to his family members in his jail phone calls suggest that he could not have chased after Lam because Lam had kicked him so hard that he fell to the ground in pain.  This is inconsistent with his trial testimony, where he initially said he did not fall to the ground and he later downplayed the pain he suffers from his hernia.  These inconsistencies, in addition to defendant's initial statement to Detective Turner, provide sufficient evidence to support giving CALCRIM No. 362.

Moreover, the jury was instructed with CALCRIM No. 200, which explains that the jury decides what the facts are and states, in part, "Some of these instructions may not apply, depending on your findings about the facts of the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."  Evidence supported CALCRIM Nos. 362 and 372, and it was up to the jury to decide whether to apply these instructions based upon the jury's factual findings.

## III.  *CALCRIM No. 509—Justifiable Homicide:  Non-peace Officer Keeping the Peace*

Defendant contends the trial court erred in rejecting his request that the jury be instructed with CALCRIM No. 509 (Justifiable Homicide:  Non-Peace Officer Keeping the Peace).  He argues substantial evidence supported

23

the instruction and that the trial court's refusal to give the instruction deprived him of his state and federal constitutional rights to present a defense and to due process. CALCRIM No. 509 states: "The defendant is not guilty of (murder/ [or] manslaughter/ attempted murder/ [or] attempted voluntary manslaughter) if (he/she) (killed/attempted to kill) someone while preserving the peace. Such (a/an) [attempted] killing is justified, and therefore not unlawful, if: [¶] 1. The defendant committed the [attempted] killing while lawfully (suppressing a riot/keeping and preserving the peace); [¶] 2. The defendant had probable cause to believe that _____<*insert name of decedent*> posed a threat of serious physical harm, either to the defendant or someone else; [¶] AND [¶] 3. The [attempted] killing was necessary to lawfully (suppress a riot/keep and preserve the peace). [¶] A person has *probable cause* to believe that someone poses a threat of serious physical harm when facts known to the person would persuade someone of reasonable caution that the other person is going to cause serious physical harm to another. [¶] [A *riot* occurs when two or more people, acting together without legal authority, disturb the public peace by use of force or violence or by threat to use force or violence with the immediate ability to carry out those threats.] [¶] [A disturbance of the public peace may happen in any place of confinement. _____<*insert name of detention facility*> is a place of confinement.] [¶] The People have the burden of proving beyond a reasonable doubt that the [attempted] killing was not justified. If the People have not met this burden, you must find the defendant not guilty of [attempted] (murder/ [or] manslaughter)."

Defense counsel acknowledged to the trial court that defendant's theory of the case was that he was not part of the assault in the alley, but he argued the instruction was appropriate because the jury could credit the testimony of

24

Kenneth H. and Reginald N. and, if so, the jury could find that defendant acted to preserve the peace. The trial court declined to give the requested instruction because it was inconsistent with the defendant's testimony that he was not involved in the assault in the alley. Whether a potential defense is inconsistent with the defendant's theory is a factor for the court to consider when determining whether to instruct sua sponte on a potential defense. (*People v. Elize* (1999) 71 Cal.App.4th 605, 615.) However, where a defendant requests an instruction on an alternative defense, the instruction should be given if it is supported by substantial evidence. (*Ibid.*) Accordingly, we consider whether substantial evidence supported giving the preserving the peace instruction.

Although there was evidence of Lam's attacking the woman at the van and potentially attempting to harm a child in the van, the People did not contend that defendant caused Lam's injury during the altercation at the van. In closing argument, the People referred to the self-defense or defense of another instruction and conceded defendant's actions at the van were justified, stating, "That's appropriate amount of force to stop the kidnapping; and the defendant is not charged with hitting Lam based on that conduct. That's justified. . . . But again, defense of another, that just applies to that situation there at the van." The prosecutor then argued that defense of another does not apply to defendant's actions in the alley, when Lam was no longer a threat to the child in the van. In considering whether there was substantial evidence to support the keeping the peace instruction (CALCRIM No. 509), we focus on the witness testimony regarding the events in the alley.

Kenneth H., Preschern, and defendant testified that Lam yelled about getting a gun as he ran to the alley. Kenneth thought Lam was going to get a gun and shoot the family in the van. There was no evidence Lam either had

25

a gun or had access to one, and Detective Turner testified that when she searched Lam's truck she did not find a gun. A crowd of people chased Lam into the alley. Kenneth testified Lam was in a rage, "charging like a bull," possibly induced by PCP. Forensic tests showed that Lam had a potentially fatal amount of methamphetamine in his system. Kenneth also testified that just before defendant hit Lam with the board, Lam was charging at defendant.

We find that while the evidence supports the self-defense or defense of another instruction (CALCRIM No. 505), it does not support CALCRIM No. 509. By the time defendant hit Lam with the board, Lam had fled into the alley from the van area. Although there was testimony that Lam yelled about getting a gun, no gun was found. There was no substantial evidence that once Lam was in the alley, he was disturbing the public peace by use of force or violence or by threats to use force or violence with the immediate ability to carry out those threats. (CALCRIM No. 509.) Instead, the evidence was that Lam had been chased into the alley and was fighting with Preschern and defendant. Whatever threat Lam posed by the van had been quelled by the time Lam ran into the alley, and there was no evidence that defendant's actions in the alley were necessary to preserve the peace.[8]

---

[8] Defendant relies on *People v. Lillard* (1912) 18 Cal.App. 343, which involved a homicide while the defendant was trying to apprehend the decedent for committing a felony. CALCRIM No. 508 (Justifiable Homicide: Citizen Arrest) sets forth the elements of a justifiable homicide by a non-peace officer lawfully trying to arrest or detain the decedent. Here, defense counsel initially requested CALCRIM No. 508 but then withdrew his request and conceded there was not "any indication" defendant was trying to arrest Lam. Nor does defendant contend on appeal that CALCRIM No. 508 should have been given. We find *Lillard* distinguishable because it involved a justifiable homicide based on an attempt to apprehend the decedent, which is not at issue here.

Further, even if we were to conclude that substantial evidence supported CALCRIM No. 509, we would find any error harmless. The jury was instructed with CALCRIM No. 505 (Justifiable Homicide: Self-Defense or Defense of Another).[9] The jury found defendant guilty of voluntary

---

[9] The jury was instructed as follows: "Justifiable Homicide, Self-Defense or Defense of Another: The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: One, the defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being kidnapped; two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and three, defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"The defendant's belief that he or someone else was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

"A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

27

manslaughter, which means it rejected the theory of self-defense or defense of others. Thus the jury refused to find that (1) defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury or being kidnapped; (2) defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; or (3) defendant used no more force than was reasonably necessary to defend against that danger. (CALCRIM No. 505.)

Instead, the jury found defendant guilty of voluntary manslaughter, which means the jury found that defendant either (1) killed Lam in a heat of passion due to provocation that would have caused a person of average disposition to act rashly and without due deliberation or (2) killed Lam in imperfect self-defense or imperfect defense of another. (CALCRIM Nos. 522, 570, 571.) If the jury convicted defendant based on imperfect self-defense or imperfect defense of another, then it found that (1) defendant actually believed he or someone else was in imminent danger of being killed or suffering great bodily injury; and (2) defendant actually believed the immediate use of force was necessary to defend against the danger, but at least one of those beliefs was unreasonable. (CALCRIM No. 571.)

Defendant argues that as compared with the self-defense instruction, CALCRIM No. 509 is a "category of justification for homicide [that] is presumed to be justifiable without a close inquiry as to whether or not it presents, even to reasonable apprehension, a danger of death or serious bodily injury." Thus, he argues, the jury may have found justification under CALCRIM No. 509 even though it rejected the self-defense and defense of

---

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 505.)

another theory.  We disagree.  As with CALCRIM No. 505, CALCRIM No. 509 also requires the jury to consider the reasonableness of defendant's beliefs.  A jury must find that the defendant had "probable cause to believe that [the decedent] posed a threat of serious physical harm, either to the defendant or someone else."  (CALCRIM No. 509.)  The instruction further states, "A person has *probable cause* to believe someone poses a threat of serious physical harm when facts known to the person would persuade someone of reasonable caution that the other person is going to cause serious physical harm to another."  (CALCRIM No. 509.)

We find that even assuming it was error not to instruct on CALCRIM No. 509, any such error was harmless.  Given the jury's rejection of the self-defense and defense of another theory, there is no reasonable probability that the jury would have found defendant's actions justified to "keep the peace" had CALCRIM No. 509 been given.  (*People v. Watson* (1956) 46 Cal.2d 818, 837.)  Even under the stricter *Chapman* standard, we find beyond a reasonable doubt that the error complained of did not contribute to the verdict.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## DISPOSITION

The judgment is affirmed.

29

_____
Jackson, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Wiseman, J.*


A157134/*People v. William Lamar Hinson III*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.